[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Halligan,* Slip Opinion No. 2019-Ohio-3748.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2019-OHIO-3748

DISCIPLINARY COUNSEL *v.* HALLIGAN.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Halligan,* Slip Opinion No. 2019-Ohio-3748.]

*Attorneys—Misconduct—Violations of the Rules of Professional Conduct, including failing to act with reasonable diligence in representing a client, failing to provide competent representation to a client, and engaging in conduct that is prejudicial to the administration of justice—Two-year suspension, with 18 months stayed and with conditions that include 18 months of monitored probation.*

(No. 2018-1090—Submitted January 9, 2019—Decided September 19, 2019.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2017-060.

_____

**Per Curiam.**

{¶ 1} Respondent, Brian Joseph Halligan of Ashland, Ohio, Attorney Registration No. 0024113, was admitted to the practice of law in Ohio in 1983.

{¶ 2} In a complaint certified to the Board of Professional Conduct on December 1, 2017, relator, disciplinary counsel, charged Halligan with multiple violations of the Rules of Professional Conduct arising from his convictions of two alcohol-related offenses, his conviction for driving while his license was under suspension, his attempt to represent a client in court while under the influence of alcohol, his lack of diligence in representing one client, his incompetent representation of and failure to reasonably communicate with another client, and his failure to refund unearned fees to two clients.

{¶ 3} The parties entered into stipulations of fact, misconduct, and aggravating and mitigating factors. Based on those stipulations and evidence presented at the June 7, 2018 hearing, the board found that Halligan engaged in the charged misconduct and recommended that he be suspended from the practice of law for two years with 18 months stayed on conditions. The board also recommended that certain conditions be placed on Halligan's reinstatement to the practice of law and that he be required to serve 18 months of monitored probation.

{¶ 4} We accept the board's findings and suspend Halligan from the practice of law for two years with 18 months stayed on the conditions recommended by the board. We also adopt the board's recommendations regarding the conditions for Halligan's reinstatement and require him to serve 18 months of monitored probation upon reinstatement.

## Misconduct

*Count One: Under the Influence of Alcohol*

{¶ 5} In November 2016, Halligan was appointed to represent Johnnie Rossi, who had been indicted on five felony charges in the Ashland County Court of Common Pleas. However, on December 16, 2016, Halligan was charged with

2

misdemeanor offenses of operating a vehicle while under the influence of alcohol ("OVI") and failing to stop within an assured clear distance ahead after he collided with a vehicle at a traffic light. He was granted limited driving privileges on December 21, 2016.

{¶ 6} Rossi's case was set for a jury trial on January 31, 2017. That morning, Rossi noticed that Halligan smelled of alcohol and was slurring his words. Court personnel overheard Rossi accuse Halligan of being intoxicated, noticed that Halligan smelled of alcohol, and alerted the judge. When the judge asked Halligan if he had consumed alcohol that morning, he stated that he had not—but at his disciplinary hearing he acknowledged that he had not volunteered that he drank a significant amount of alcohol the night before. The judge went on the record and noted that court personnel had smelled alcohol and that Halligan refused to submit to a breath-alcohol test. He removed Halligan from the case and continued Rossi's jury trial.

{¶ 7} Halligan left the courthouse. Law-enforcement officers responding to a report of Halligan's apparent intoxication found him seated in the driver's seat of his car and observed signs of his intoxication. He admitted to having had several alcoholic beverages the night before but denied that he had consumed any alcohol that morning.

{¶ 8} Law-enforcement officers arrested Halligan and drew his blood for a blood-alcohol test approximately four hours after Rossi's jury trial had been scheduled to start. Although Halligan claimed that he did not feel that he was impaired that morning, his blood-alcohol concentration was .108 grams by weight of alcohol per 100 milliliters of whole blood.[1] Halligan was charged in Ashland

---

1. For purposes of a violation of R.C. 4511.194 for having physical control of a vehicle while under the influence, a person is under the influence of alcohol if the person has a concentration of at least .08 percent but less than .17 percent by weight per unit volume of alcohol in the person's whole blood. *See* R.C. 4511.19(A)(1)(b) and 4511.194(A)(2).

Municipal Court with a misdemeanor offense of having physical control of a vehicle while under the influence of alcohol. As a result of the new charge, the driving privileges the court had granted in his earlier OVI case were revoked on February 14, 2017, but Halligan did not receive notice of that revocation.

{¶ 9} When Halligan appeared for a hearing on his physical-control charge on March 13, 2017, court-security and law-enforcement personnel noticed that Halligan again smelled of alcohol. The police department also received information that Halligan had driven himself to the courthouse despite the fact that he might not have had driving privileges. Following the hearing, Halligan left the courthouse, got into his car, and drove out of the parking lot. A law-enforcement officer then stopped him. The officer observed signs of intoxication, and Halligan admitted that he had consumed vodka the night before, but he denied having had any alcoholic beverages recently. Halligan was charged with OVI and driving under suspension. Analysis of a blood sample obtained from Halligan that day showed that he had a blood-alcohol concentration of .037 grams by weight of alcohol per 100 milliliters of whole blood.

{¶ 10} In August 2017, Halligan pleaded guilty to the charge of having physical control of a vehicle while under the influence of alcohol and the charge of driving under suspension; the March OVI charge was dismissed. The judge sentenced him to 30 days in jail, all suspended on the condition that he complete a one-year period of probation, and to pay a fine for the physical-control conviction, and 60 days in jail with 57 days suspended on the condition that he complete one year of probation for driving under suspension.

{¶ 11} In September, Halligan pleaded guilty to his December OVI charge. The court dismissed the remaining charge and sentenced Halligan to 180 days in jail with 177 days suspended, ordered him to pay a fine, and suspended his driver's license for one year.

**{¶ 12}** Based on this conduct, the parties stipulated and the board found that Halligan violated Prof.Cond.R. 1.1 (requiring a lawyer to provide competent representation to a client), 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and 8.4(d) (prohibiting a lawyer from engaging in conduct that is prejudicial to the administration of justice). They also agreed that Halligan's use of alcohol, his pattern of alcohol-related traffic offenses, and his court appearances on behalf of himself and his clients while under the influence of alcohol were sufficiently egregious to support an additional finding that his conduct adversely reflected on his fitness to practice law in violation of Prof.Cond.R. 8.4(h). *See Disciplinary Counsel v. Bricker*, 137 Ohio St.3d 35, 2013-Ohio-3998, 997 N.E.2d 500, ¶ 21.

*Count Two: Neglect and Failure to Refund Unearned Fee*

**{¶ 13}** Halligan agreed to represent Ted Kyser in a small-claims matter for a flat fee of $200 plus the filing fee. On August 11, 2016, he sent Kyser a text message stating, "I will prepare the small claims complaint on your behalf and you file it. I will appear at the trial and try it on your behalf." Kyser paid the $200 flat fee that day. Ten days later, Halligan notarized Kyser's signature on the complaint. Kyser called multiple times to inquire about the status of the filing. Halligan did not always respond, but when he did, he stated that the complaint had not been filed or that he was verifying whether it had been filed.

**{¶ 14}** In October, Kyser asked Halligan to send him a copy of a letter that Halligan had purportedly sent to the defendant's attorney and to refund his money because Halligan had not yet filed the complaint. Halligan told him, "I will represent you at the trial * * * I will get it done." He told Kyser that that he would personally file the complaint the next day, but he waited more than one month to complete the filing. Although court documents identified Halligan as Kyser's counsel, Halligan told Kyser that Halligan's presence was not required for a scheduled conciliation and pretrial hearing. Kyser attended the hearing without

counsel and later informed Halligan that the court had scheduled a February 15, 2017 trial.

{¶ 15} As the trial date approached, Kyser sent Halligan several text messages—one reminding him of the trial date and asking if they needed to meet, a second asking if Halligan was "good for Wednesday [the day of trial]," and a third, just two days before trial, stating, "Guess we'll do this without your council [sic], I'll get with you about refund of money paid for representation." Halligan did not receive or respond to the messages because law-enforcement officers had seized his cell phone during his January 31, 2017 arrest and kept it for approximately three months. Halligan effectively withdrew from the representation when he failed to appear at the trial. And he did not refund any portion of his flat fee.

{¶ 16} The parties and the board agreed that this conduct violated Prof.Cond.R. 1.3 (requiring a lawyer to act with reasonable diligence in representing a client) and 1.16(e) (requiring a lawyer to promptly refund any unearned fee upon the lawyer's withdrawal from employment).

*Count Three: Incompetent Representation, Failure to Keep Client Reasonably Informed, and Failure to Refund Unearned Fee*

{¶ 17} In December 2016, MHP Management, L.L.C., retained Halligan to file an eviction action against one of its tenants. In January, Halligan filed a complaint seeking to evict the tenant and recover $1,483 in damages for unpaid rent and fees. The next day, an entry was issued in the case stating that the check that Halligan had issued for MHP's filing fee was one dollar short and that it was returned to Halligan with a statement of costs for $111.[2] However, Halligan had billed MHP $961 for his representation and the $111 filing fee, and the company had paid him in full.

---

2. The numerical portion of the check was written for "$110.00," but in words, the amount on the check stated, "One hundred and eleven dollars 00/100."

6

{¶ 18} Neither the parties nor Halligan appeared at a February hearing on MHP's complaint. Consequently, the court dismissed the case, ordered MHP to pay the costs associated with the case, and ordered MHP or Halligan to pay the delinquent filing fee within ten days. Halligan admitted that he failed to communicate with MHP after he missed the scheduled hearing or to inform the company that its case had been dismissed. After receiving notice of the dismissal from the court, and despite having already remitted the filing fee to Halligan, MHP paid the $111 filing fee directly to the court. At Halligan's disciplinary hearing, he admitted that he owed the company restitution of $111 for that fee.

{¶ 19} The parties and the board agreed that Halligan's conduct in MHP's case violated Prof.Cond. R. 1.1, 1.4(a)(3) (requiring a lawyer to keep the client reasonably informed about the status of a matter), and 1.16(e).

## Sanction

{¶ 20} When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

{¶ 21} The parties stipulated that four aggravating factors are present: Halligan acted with a dishonest or selfish motive, engaged in a pattern of misconduct, committed multiple offenses, and failed to make restitution to the clients harmed by his misconduct. *See* Gov.Bar R. V(13)(B)(2), (3), (4), and (9).

{¶ 22} Based on Halligan's testimony at the disciplinary hearing, the board found that two additional aggravating factors are present. First, the board found that Halligan failed to take full responsibility for his misconduct based on the fact that his testimony at the disciplinary hearing often conflicted with his stipulations. *See* Gov.Bar R. V(13)(B)(7). For example, Halligan maintained that he was not under the influence of alcohol on the morning of Rossi's scheduled jury trial even though he stipulated to the facts surrounding his alcohol-related offenses and the

uncontroverted evidence of his blood-alcohol concentration that day. Halligan also insisted that the $200 fee he charged Kyser covered only filing the complaint— even though he stipulated that he had agreed to file the complaint *and* represent Kyser at trial for that flat fee. Furthermore, Halligan attempted to downplay his own responsibility for his actions by suggesting that Rossi had accused him of being intoxicated as part of a plan to terminate his representation, that he faced criminal charges because the police were after him, and that a magistrate who had previously been his landlord had "drummed this stuff up."

**{¶ 23}** The board also expressed concern about Halligan's use of alcohol. At his disciplinary hearing, Halligan testified that he has had periodic issues with alcohol for 10 to 15 years. He explained that after several years of sobriety, he began drinking to help him sleep and to avoid using prescribed opiates following a 2015 surgery. Halligan testified that at the time of his disciplinary hearing, he had not engaged in alcohol-related counseling for three to four years and had not attended an Alcoholics Anonymous meeting for approximately two years. In the months leading up to his disciplinary hearing he sought an alcohol assessment but completed it just days before his disciplinary hearing. According to Halligan, the counselor who conducted the assessment recommended that he acknowledge that he is an alcoholic and commence weekly counseling sessions. The board found that Halligan's failure to begin treatment for his alcohol-related offenses before his disciplinary hearing qualified as an aggravating factor.

**{¶ 24}** The board adopted three of the parties' four stipulated mitigating factors—Halligan had no prior disciplinary offenses, he presented evidence of his good character and reputation, and he had had other penalties or sanctions imposed for his criminal conduct. *See* Gov.Bar R. V(13)(C)(1), (5), and (6). The parties also stipulated that Halligan made full and free disclosure of his conduct and cooperated during the pendency of this matter. *See* Gov.Bar R. V(13)(C)(4). Citing

8

the conflicts between Halligan's testimony and his stipulations, however, the board found that his cooperation was limited to his prehearing disclosures.

{¶ 25} In determining the appropriate sanction for Halligan's misconduct, the board noted that Halligan was not forthcoming with the court about his use of alcohol before Rossi's trial, and it recognized the proposition that "an actual suspension should be imposed for dishonest conduct, particularly when that conduct is designed to 'mislead a court or client,' " *Disciplinary Counsel v. Rooney*, 110 Ohio St.3d 349, 2006-Ohio-4576, 853 N.E.2d 663, ¶ 13, quoting *Akron Bar Assn. v. Holder*, 102 Ohio St.3d 307, 2004-Ohio-2835, 810 N.E.2d 426, ¶ 43. In *Rooney*, this court imposed a six-month suspension from the practice of law on an attorney who had repeatedly assured his client that he was taking care of a probate matter despite the fact that he never filed any documents in court.

{¶ 26} The board also considered our decision in *Columbus Bar Assn. v. Gill*, 137 Ohio St.3d 277, 2013-Ohio-4619, 998 N.E.2d 1141. A judge suspected that Gill, like Halligan, was under the influence of alcohol while he was representing a client in court. Gill also pleaded guilty to a single count of reckless operation of a motor vehicle after hitting a car on the highway, fleeing the scene, and failing to report the accident. All told, Gill committed more than 40 rule violations arising from nine grievances, with many of those violations arising from his failure to have or use a client trust account, his failure to effectively communicate with multiple clients, and his failure to respond to the relator's inquiries about those matters.

{¶ 27} Unlike Halligan, Gill had a history of prior discipline. Gill also acknowledged the wrongfulness of his conduct and established that his alcoholism and a recently diagnosed mental disorder qualified as mitigating factors with regard to at least some of his misconduct. Gill had entered into a five-year contract with the Ohio Lawyers Assistance Program ("OLAP"), had followed all of OLAP's treatment recommendations, and had been sober for nearly a year at the time of his

disciplinary hearing. Given his significant history of alcohol-related relapses, we suspended Gill from the practice of law for two years, with the second year stayed on the condition that he wear an alcohol-monitoring device. To protect the public and support Gill's ongoing treatment, we also placed stringent conditions on his reinstatement to the practice of law and ordered him to serve two years of monitored probation.

{¶ 28} After comparing Halligan's conduct and the relevant aggravating and mitigating factors in this case to those in *Gill*, the board recommended that we impose a two-year suspension with 18 months stayed on conditions for Halligan's misconduct, including a requirement that he submit to an OLAP assessment, that we condition his reinstatement upon compliance with his court-ordered probation and the terms of any contract recommended by OLAP, and that we require him to serve 18 months of monitored probation.

{¶ 29} We accept the board's findings of fact, misconduct, and aggravating and mitigating factors. We also find that the board's recommended sanction is consistent with the sanction in *Gill* and the sanctions we have imposed on other attorneys who have attempted to represent their clients while under the influence of alcohol. We agree that the recommended sanction is appropriate in this case. *See, e.g.*, *Disciplinary Counsel v. Wineman*, 121 Ohio St.3d 614, 2009-Ohio-2005, 906 N.E.2d 1117 (imposing a two-year suspension stayed in its entirety on an attorney in the complete absence of any aggravating factors and the presence of multiple mitigating factors, including the attorney's full cooperation in the disciplinary process and the absence of dishonesty); *Disciplinary Counsel v. Scurry*, 115 Ohio St.3d 201, 2007-Ohio-4796, 874 N.E.2d 521 (imposing a two-year suspension stayed in its entirety, with a five-year period of monitored probation, on an attorney whose alcoholism qualified as a mitigating factor).

{¶ 30} Accordingly, Brian Joseph Halligan is suspended from the practice of law in Ohio for two years with 18 months stayed on the conditions that he engage

in no further misconduct and that within 60 days of the date of this order, he (1) submit proof that he has completed an OLAP assessment and executed the necessary releases to authorize OLAP to discuss his case with relator and (2) make restitution of $200 to Ted Kyser and $111 to MHP Management, L.L.C. As conditions of reinstatement to the practice of law, Halligan shall be required to submit proof that he has complied with the terms of his court-ordered probation in the Ashland Municipal Court cases and that he has abstained from the use of alcohol, that he is in compliance with the terms of any contract arising from his OLAP assessment, and that he has paid the costs of these proceedings. Upon his reinstatement to the practice of law, he shall serve 18 months of monitored probation in accordance with Gov.Bar R. V(21). Costs are taxed to Halligan.

Judgment accordingly.

O'CONNOR, C.J., and FRENCH and DONNELLY, JJ., concur.

FISCHER, J., concurs, with an opinion.

STEWART, J., concurs in judgment only.

KENNEDY, J., concurs in part and dissents in part, with an opinion joined by DEWINE, J.

_____

**FISCHER, J., concurring.**

{¶ 31} I concur in the court's decision, but I write separately to address the dissatisfaction with this court's order of a general term of monitored probation that is expressed in an opinion concurring in part and dissenting in part. I wholeheartedly agree with the assertion found in that opinion that monitored probation is a valuable—I would say necessary—tool in Ohio's attorney-discipline system. *See Disciplinary Counsel v. Sarver*, 155 Ohio St.3d 100, 2018-Ohio-4717, 119 N.E.3d 405, ¶ 45-47 (Fischer, J., concurring in part and dissenting in part). However, I do not agree that this court must set forth specific conditions every time

that monitored probation is imposed. Neither the Rules for the Government of the Bar nor this court's case law supports such a requirement for specificity.

{¶ 32} This court has a duty to oversee the practice of law in this state under Article IV, Sections 2(B)(1)(g) and 5(B) of the Ohio Constitution. As the final arbiter of attorney discipline, this court makes the ultimate conclusion as to the facts and imposes the ultimate sanction, if any, in disciplinary cases. *See Cincinnati Bar Assn. v. Heitzler*, 32 Ohio St.2d 214, 220, 291 N.E.2d 477 (1972). The possible sanctions include monitored probation. *See* Gov.Bar R. V(12)(A).

{¶ 33} Though this court can order monitored probation as a sanction, we are by no means required, as advocated in the opinion concurring in part and dissenting in part, to attach specific conditions to the terms of the monitored probation. Under Gov.Bar R. V(12)(A)(4), this court may order probation with those conditions we deem necessary. Similarly, Gov.Bar R. V(12)(I), which allows a disciplinary hearing panel to recommend a period of probation, requires that the panel "include in its report *any* conditions of probation." (Emphasis added.) The language of these two rules indicates then that this court may impose a term of probation *without* conditions. The failure to impose probation without specific conditions is not, as the opinion concurring in part and dissenting in part concludes, "an abdication of our duty under the Rules for the Government of the Bar." *Id.* at 41. Rather, this court must tailor an attorney's monitored probation to the specific facts of each case and the needs of the attorney who is being disciplined.

{¶ 34} This court has ordered various types of monitored probation, ranging from a general term of probation without specific conditions, *see, e.g.*, *Sarver*, 155 Ohio St.3d 100, 2018-Ohio-4717, 119 N.E.3d 4717, at ¶ 32 (ordering "a two-year period of monitored probation in accordance with Gov.Bar R. V(21)"), to a very specific and detailed term of probation, *see, e.g.*, *Disciplinary Counsel v. Bennett*, 146 Ohio St.3d 237, 2016-Ohio-3045, 54 N.E.3d 1232, ¶ 19 (ordering "a three-year period of monitored probation during which [the respondent] must cooperate and

work with the monitor, who shall act as a mentor and provide guidance to [the respondent] regarding the proper operation and management of a law practice" and further requiring that "during the first 12 months of [the respondent's] probationary period, he must complete at least six hours of continuing-legal education courses approved by relator on law-office management and operations").

**{¶ 35}** This court's longstanding practice has been to analyze each attorney-discipline case on its own basis and to impose sanctions tailored to the particular facts of each case. Doing so allows us to impose very specific conditions of probation in cases in which an attorney's misconduct involves a particular type of action or inaction that can be addressed, in part, through specific monitoring. *See Akron Bar Assn. v. Parkin*, 155 Ohio St.3d 596, 2018-Ohio-5093, 122 N.E.3d 1256, ¶ 36 (ordering "a two-year period of monitored probation in accordance with Gov.Bar R. V(21) to ensure that [the respondent] has implemented law-office management policies and procedures to comply with the Rules of Professional Conduct").

**{¶ 36}** In other cases, ordering a general term of probation without specific conditions enables us to keep " 'on a short leash,' " *see Sarver* at ¶ 47 (Fischer, J., concurring in part and dissenting in part), a lawyer who has been investigated numerous times but who has not been previously charged (perhaps because a relator believed that the evidence presented was not clear and convincing evidence). A general term of probation without specific conditions may also be appropriate in cases in which this court, the Board of Professional Conduct, or the hearing panel may not be privy to all the details of a respondent's situation but may still believe that some type of ongoing relationship, such as monitored probation, might be helpful in protecting the public and assisting the attorney in his or her return to practice. For example, a relator may know or believe, based on experience and the facts developed in the case, that a respondent has an illness (such as an alcohol, drug, or gambling addiction) that the respondent will not acknowledge or that the

respondent has acted out of character while dealing with the death of a family member or friend. In these and many other instances, imposing a general term of probation without conditions enables this court to ensure that the respondent will be monitored while also respecting the potentially sensitive nature of the case. The public is then protected, and it may be that the life of the lawyer is made better as well.

{¶ 37} The rules currently provide for the imposition of monitored probation without specific conditions when appropriate. Even when no specific conditions are imposed by this court, Gov.Bar R. V(21) lists several conditions for probation. Because ordering a general term of monitored probation without specified conditions is appropriate in a variety of cases, I respectfully disagree with the conclusion of the opinion concurring in part and dissenting in part that this court must set forth specific conditions every time that we impose monitored probation. I accordingly concur fully in the court's decision.

_____

**KENNEDY, J., concurring in part and dissenting in part.**

{¶ 38} I agree with the majority that in order to protect the public, an actual suspension of respondent is warranted, and I concur in the following part of the court's order:

Brian Joseph Halligan is suspended from the practice of law in Ohio for two years with 18 months stayed on the conditions that he engage in no further misconduct and that within 60 days of the date of this order, he (1) submit proof that he has completed an [Ohio Lawyers' Assistance Program ("OLAP")] assessment and executed the necessary releases to authorize OLAP to discuss his case with relator and (2) make restitution of $200 to Ted Kyser and $111 to MHP Management, L.L.C. As conditions of reinstatement to the practice

14

of law, Halligan shall be required to submit proof that he has complied with the terms of his court-ordered probation in the Ashland Municipal Court cases and that he has abstained from the use of alcohol, that he is in compliance with the terms of any contract arising from his OLAP assessment, and that he has paid the costs of these proceedings.

Majority opinion at ¶ 30.

{¶ 39} I part ways with the majority over the lack of detail regarding the period of probation imposed by the court after respondent Brian Joseph Halligan's reinstatement to the practice of law. I agree that probation is appropriate but disagree with the generic, standard-free way it is imposed in this case. The majority opinion states, "Upon his reinstatement to the practice of law, he shall serve 18 months of monitored probation in accordance with Gov.Bar R. V(21)." This nonspecific condition gives little guidance to Halligan or his monitor and does not promote public confidence that the underlying causes of Halligan's misconduct will be addressed.

{¶ 40} Too often, this court issues orders for probation that lack specific conditions—orders that state simply that a respondent is on probation for a set term. *See, e.g., Akron Bar Assn. v. DeLoach,* 143 Ohio St.3d 39, 2015-Ohio-494, 34 N.E.3d 88, ¶ 20*; Disciplinary Counsel v. Bartels,* 151 Ohio St.3d 144, 2016-Ohio-3333, 87 N.E.3d 155, ¶ 16, reinstated, 150 Ohio St.3d 1284, 2017-Ohio-4432, 82 N.E.3d 1171, ¶ 3; *Disciplinary Counsel v. Jackson,* 146 Ohio St.3d 341, 2016-Ohio-1599, 56 N.E.3d 936, ¶ 9. In other instances, we have provided more detail and imposed conditions concerning law-office management to improve a respondent's ability to ethically engage in the practice of law. *See, e.g., Disciplinary Counsel v. Bennett*, 146 Ohio St.3d 237, 2016-Ohio-3045, 54 N.E.3d 1232, ¶ 19; *Akron Bar Assn. v. Bednarski*, 148 Ohio St.3d 615, 2017-Ohio-522, 71

N.E.3d 1093, ¶ 19-21; *Cleveland Metro. Bar Assn. v. Gay*, 153 Ohio St.3d 251, 2018-Ohio-2170, 104 N.E.3d 745, ¶ 15.

**{¶ 41}** We must establish conditions every time we impose probation. Monitored probation is a valuable tool in Ohio's discipline system; it enables us to protect the public while educating the attorney and correcting the underlying misconduct. But our failure to attach conditions to probation is more than a missed opportunity to set the criteria and goals for professional redemption, it is an abdication of our duty under the Rules for the Government of the Bar.

**{¶ 42}** Only this court has the authority to set the conditions for probation; we also have the *duty* to impose conditions when we impose probation. Gov.Bar R. V(12)(A) provides that any judicial officer or attorney found guilty of misconduct shall be disciplined. Gov.Bar R. V(12)(A)(4) provides that this court may impose, in conjunction with an order of suspension, "probation for a period of time upon conditions as the Supreme Court determines." Those conditions define the duties of the relator and the monitor in regard to probation. They also define the expectations this court has of a respondent.

**{¶ 43}** Gov.Bar R. V(21) establishes the basic procedures of probation, and conditions are essential to the scheme. Gov.Bar R. V(21)(A)(1) states that "[i]f the disciplinary order entered by the Supreme Court imposes a term of probation," the relator shall "[s]upervise the term and conditions of probation." The specified duties of the monitoring attorney are tied to the conditions set by this court: Gov.Bar R. V(21)(B)(1) provides that the monitoring attorney shall "[m]onitor compliance by the respondent with the conditions of probation imposed by the Supreme Court"; Gov.Bar R. V(21)(B)(2) provides that the monitoring attorney shall "[f]ile with the relator * * * written, certified reports regarding the status of the respondent and compliance with the conditions of probation"; and Gov.Bar R. V(21)(B)(3) provides that the monitoring attorney shall "[i]mmediately report to the relator any violations by the respondent of the conditions of probation." Under Gov.Bar R.

V(21)(E), "[t]he relator immediately shall investigate any report of a violation of the conditions of probation by the respondent." The respondent faces sanctions by this court for failing to abide by the conditions of probation. Gov.Bar R. V(21)(K). And pursuant to Gov.Bar R. V(21)(D), when applying for a termination of probation, the respondent must include an affidavit "stating that the respondent has complied with the conditions of probation." This court orders the termination of probation if all costs have been paid, no formal discipline proceedings are pending against the respondent, and "the respondent has complied with the conditions of probation." Therefore, the probation procedure rests entirely on the conditions set by this court.

{¶ 44} The efficacy of probation also rests on the conditions set by this court. Without guidance as to the specific conditions of probation—conditions specifically designed by this court to protect the public and rehabilitate the respondent—a term of monitored probation has little value. In an instance of monitored probation without conditions, who determines what the monitor is monitoring? What is the focus of interactions between the disciplined attorney and the monitor? What kind of access does the monitor have to the disciplined attorney's case files, to his or her billing records? And what constitutes a violation of probation? In a case in which this court sets no conditions, answers to these questions could result only from conditions imposed by someone other than this court, which would be directly contrary to Gov.Bar R. V(12)(A)(4), which, again, allows "[p]robation for a period of time upon conditions as the Supreme Court determines."

{¶ 45} A term of probation should have sufficient conditions tied to a respondent's violations to protect the public from further violations of the Rules of Professional Conduct. Supervisory activities should be tailored to benefit a respondent. It is critical for the long-term success of a respondent who has been disciplined that each case be evaluated on the facts and circumstances of the

misconduct. Much like a trial-court judge who must impose individualized sentencing for each defendant, this court should impose individualized conditions for each term of monitored probation.

{¶ 46} Therefore, in this case, I would impose the following specific conditions for the term of probation: (1) respondent must abstain from alcohol, (2) if respondent has completed his contract with OLAP (if one is ordered), before the term of probation imposed under this case ends, respondent shall purchase and wear an alcohol monitor and execute a release with the provider of that monitor to allow the probation supervisor—the relator or a monitoring attorney—to access the data from the monitor, (3) respondent shall maintain an active-case list or a docketing system and shall give the relator or monitoring attorney an inventory of active cases each month, (4) each month, respondent shall give the relator or monitoring attorney all the fee agreements, including flat-fee agreements, that he enters into with clients so that the relator or monitoring attorney can review them, (5) each month, the relator or monitoring attorney shall randomly review files of respondent's active cases to ensure his compliance with the Rules of Professional Conduct, (6) prior to the termination of probation, as part of his continuing-legal-education requirements under Gov.Bar R. X, respondent shall attend a continuing-legal-education seminar that includes instruction on fee agreements and the requirements for flat-fee agreements, (7) respondent, with the relator or monitoring attorney, shall design a comprehensive plan to ensure that he is reasonably diligent in the representation of his clients. In the event respondent cannot act with reasonable diligence in representing his clients, the relator or monitoring attorney may limit the number of active cases respondent may maintain.

{¶ 47} An effective attorney-probation system—one that follows the Rules for the Government of the Bar—requires the considered input of this court in establishing the conditions of probation. Because the majority imposes a term of probation without conditions, I dissent in part.

18

DeWINE, J., concurs in the foregoing opinion.

_____

Scott J. Drexel, Disciplinary Counsel, and Lia J. Meehan, Assistant Disciplinary Counsel, for relator.

Brian Joseph Halligan, pro se.

_____